## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- X
                                                               :
CHANETTO RIVERS,                                               :    Civil Case No.: 23-4084
                                                               :
          Plaintiff,                                           :
                                                               :
-against-                                                      :    COMPLAINT AND
                                                               :    DEMAND FOR JURY TRIAL
                                                               :
THE CITY OF NEW YORK, JESS DANNHAUSER,                         :
Commissioner of the Administration for Children's             :
Services, in his official capacity, YERIKA ABREU, in           :
her individual capacity, and FRANK LAWANI, in his              :
individual capacity,                                           :
                                                               :
          Defendants.                                          :
------------------------------------------------------------- X
```

### Nature of the Case

1.      Plaintiff Chanetto Rivers is a Black mother who fell victim to Defendants'
pervasive discriminatory practices when the Administration for Children's Services ("ACS")
illegally separated her from her baby boy ("TW") shortly after his birth, denying Ms. Rivers and
TW the opportunity to bond with each other in the first week of TW's life.

2.      While ACS is tasked with protecting New York State's interest in the welfare of
children, ACS has long known—through the State's own data—that Black families, like Ms.
Rivers and TW, face separation and surveillance by ACS at much higher levels than white families.
The State itself recognizes that there is an "extreme disparity" between ACS surveillance and
separation of Black families as compared to white families.

3.      Far from keeping children safe, ACS's disparate treatment of Black families causes
lasting, intergenerational trauma. ACS's racial bias has been hiding in plain sight since at least
2010. While State data showed that Black children are more than five times more likely than white

children to be involved in a report of abuse or neglect, once ACS is involved, they are more than *thirteen* times more likely than white children to be placed in foster care by ACS. Year after year, State data continues to show extreme disparities in ACS outcomes for Black families. ACS's own Commissioner at the time publicly acknowledged in 2015 that the factor motivating the racial disparity "is really racism." Despite ample notice of these disparate outcomes, ACS has failed to take meaningful action to address them.

4.      Facing growing public pressure, in the spring of 2020, ACS underwent a racial equity audit of the agency ("2020 Racial Equity Audit"). The ACS Commissioner at the time touted the audit to the New York City Council after it was underway. But then ACS fell silent about the audit's results. It turns out that the 2020 Racial Equity Audit—disclosed only because of a Freedom of Information Law Request—was damning, finding that ACS wrought systemic and deliberate racialized harm. After extensive interviews, including of ACS staff, the researchers concluded that ACS is "a predatory system that specifically targets Black and Brown parents," that ACS is more likely to give white parents "leniency with respect to removals and reunifications" of children, that ACS employees hold "pervasive anti-Black stereotypes about the abilities of Black and Brown parents to provide for their children," and that ACS "presumed" Black parents "to be a risk to their children and are often stripped of their abilities to make decisions about their families." It also found that the management culture at ACS is one of "fear and intimidation," creating incentives for ACS staff to seek removal of children from the home to protect the staff from criticism and retribution from ACS leadership. Rather than follow through on the extensive recommendations in the 2020 Racial Equity Audit, ACS tried to bury the audit and failed to take the recommended corrective actions. This and other evidence shows that ACS has a policy,

practice, and/or custom of using its vast government power punitively against Black parents because of their race.

5.      ACS's pervasive racial bias against Black parents led ACS to violate State law and remove TW from Ms. Rivers when he was just a few days old. Shortly after TW was born, without her consent, the hospital drug tested Ms. Rivers and her baby; when the tests came back positive for marijuana, the hospital called ACS. The defendants in this action swiftly instructed the hospital to hold TW in the hospital indefinitely, so that he could not go home when he was medically cleared for discharge. Even after a judge required ACS to reunite Ms. Rivers with her baby, ACS continued to subject Ms. Rivers to needless court proceedings and a litany of conditions that interfered with her parenting of TW for months, while the unlawful removal of her baby was ratified by senior ACS leadership. This was not because ACS was trying to protect TW; this was because Ms. Rivers is Black.

6.      ACS took these actions against Ms. Rivers despite the fact that, six months earlier, the State of New York enacted a law—the Marihuana Regulation and Taxation Act (MRTA)— legalizing marijuana and preventing families from being separated based on marijuana use because of a long history of racial bias in using marijuana as a pretext to improperly interfere with families of color. The New York State Legislature explicitly found that past marijuana law and practices had resulted in "devastating collateral consequences including mass incarceration and other complex generational trauma … [that] have disproportionately impacted African-American and Latinx communities." N.Y. Cᴀɴʙꜱ Lᴀᴡ § 2. To "end the racially disparate impact of existing cannabis laws," the MRTA mandates that "[n]o person may be denied custody of or visitation or parenting time with a minor... solely for conduct permitted under this chapter...," that is, for marijuana use. *Id.* §§ 2, 127(5).

7.      In separating Ms. Rivers from her child and then subjecting her to intrusive government surveillance of her parenting, Defendants ignored New York law, including the MRTA; they ignored the 2020 Racial Equity Audit, which was reviewed by ACS leadership nine months before TW was born; and they ignored years of State data showing racial disparities in ACS operations. Instead, they embraced the racial biases that define the agency and chose a discriminatory course of conduct that caused Ms. Rivers trauma, stress, pain, and anguish—and deprived her of precious time with her newborn baby that she can never get back.

8.      Ms. Rivers brings this action seeking relief for Defendants' violation of her rights, privileges, and immunities secured by 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Constitution, and laws of the State of New York, and the Marihuana Regulation and Taxation Act.

## Parties

9.      Plaintiff Chanetto Rivers ("Ms. Rivers") is 34 years old. She is and was, at all relevant times, a resident of the County of the Bronx, State of New York.

10.     Defendant the City of New York is a municipal corporation organized and incorporated pursuant to the laws of the State of New York.

11.     Defendant Jess Dannhauser is the Commissioner of ACS, which is an agency of the City of New York. He is sued in his official capacity. ACS is headquartered at 150 William Street in New York County. Defendant Dannhauser and Defendant City of New York are together the "City Defendants" or "ACS."

12.     Upon information and belief, Defendant Yerika Abreu, ACS # 6512731, was employed during 2021 by the City of New York as a Child Protective Specialist for ACS. Defendant Abreu was at all relevant times acting within the scope of her employment, and her

actions were approved by ACS supervisors and leadership, including Defendant Lawani. Defendant Abreu is sued in her individual capacity.

13.     Upon information and belief, Defendant Frank Lawani was employed during 2021 by the City of New York as a supervisor for ACS. Defendant Lawani was at all relevant times acting within the scope of his employment, and his actions were approved by ACS supervisors and leadership.  Defendant Lawani is sued in his individual capacity.  Defendant Abreu and Defendant Lawani are together the "Individual Defendants."

## Jurisdiction & Venue

14.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States, and Article I, Sections 6 and 11 of the New York Constitution. Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(a)(3), as this is a civil action arising under the Constitution and laws of the United States. This Court has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367(a).

15.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because all events giving rise to Plaintiff's claims occurred in this district.

## Statement of Facts

**I.   ACS separated Ms. Rivers from her newborn baby, interfering with her parenting in the precious first days of her son's life.**

16.     Ms. Rivers gave birth to her baby boy TW on August 28, 2021. TW was born full term.

17.     Ms. Rivers had experienced a peaceful pregnancy: she had been meditating, connecting with her spirituality, and enjoying the sunshine. She was excited for her baby to arrive.

18.     When the baby was born, she was overwhelmed with happiness and drained by the birth.

19.     Unbeknownst to Ms. Rivers, the hospital tested Ms. Rivers and TW for drugs on August 28, 2021, and the tests came back positive for marijuana. The hospital did not request Ms. Rivers' consent before it performed a drug test on her or her baby, nor did it inform her that it was doing so. No medical purpose for the test was noted in either Ms. Rivers' or TW's chart. Neither Ms. Rivers nor TW received any treatment or medical counseling from the hospital related to the marijuana test results.

20.     At the time the hospital drug tested Ms. Rivers, the use of marijuana was legal under New York law, and had been for almost five months.

21.     Nevertheless, on August 29, 2021, the hospital made a report to the New York State Central Registry, triggering an investigation by ACS.

22.     On or about August 30, 2021, ACS, by and through Defendant Abreu, placed a social hold on TW, directing the hospital not to release TW to Ms. Rivers but rather to hold the baby indefinitely, pending further instruction from ACS.

23.     Defendant Abreu was, at the time, under the supervision of Defendant Lawani.

24.     At the time that ACS took this action, the New York State Legislature had publicly acknowledged the harm that the criminalization of marijuana caused to Black and brown communities, and, through the MRTA, mandated that "No person may be denied custody of or visitation or parenting time with a minor under the family court act, domestic relations law or social services law, solely for [marijuana use]…". N.Y. CANBS LAW § 127(5).

25.     Defendants Lawani and Abreu did not seek or obtain a court order authorizing the removal and detention of TW from Ms. Rivers. Ms. Rivers never consented to the removal or detention of her baby.

26.     Defendants Lawani and Abreu had no reason to believe that TW had been the victim of child neglect or was at imminent risk of danger, and had no basis to effectuate his extrajudicial removal from Ms. Rivers.

27.     TW was medically cleared to be released on or about August 31, 2021. Pursuant to ACS's direction, the hospital refused to release TW to Ms. Rivers. Defendants, therefore, caused TW to be held at the hospital, despite being ready to go home with his mother. From this moment onward, TW was separated from Ms. Rivers solely due to ACS's directive to the hospital, which in turn was solely based on Ms. Rivers' alleged use of marijuana.

28.     Defendants forcibly separated Ms. Rivers from her newborn mere days after she gave birth to him.

29.     After violating Ms. Rivers' rights through the unlawful social hold on TW, Defendants Abreu and Lawani then doubled down on their unlawful conduct and failed to comply with New York state law that required them to either return the baby to his parent or obtain court review of the "emergency" removal within one business day, as required by N.Y. Fam. Ct. Act § 1026.

30.     Ms. Rivers suffered fear, trauma, distress, humiliation, pain and suffering, terror, and mental anguish due to her separation from her infant son within his first week of life. She felt overwhelmed and hopeless.

31.     Ms. Rivers' forced separation from TW was particularly traumatic and damaging because he was a newborn, so Ms. Rivers and TW missed crucial moments of bonding, feeding, and skin-to-skin contact.

**II.    ACS used marijuana as a pretext to separate Ms. Rivers from her son and interfere with the custody and care of her child, in violation of New York state law.**

32.     On or about September 1, 2021, Defendants Lawani and Abreu held a Child Safety

Conference with Ms. Rivers at which Defendants Lawani and Abreu recommended that ACS file a neglect case against Ms. Rivers and that ACS seek to place TW in foster care.

33.    On or about September 2, 2021, ACS filed a neglect petition against Ms. Rivers. The petition was signed by Defendant Abreu on behalf of Defendant Dannhauser's predecessor, David A. Hansell, Commissioner of ACS.

34.    ACS based its interference with Ms. Rivers' care and custody of her baby on her use of marijuana: the petition alleged that "[b]oth the subject child [TW] and the respondent mother [Ms. Rivers] tested positive for marijuana," and that a hospital staff member "believes the respondent mother is smoking marijuana in her hospital room."

35.    The petition contained additional pretextual allegations, namely that Ms. Rivers was previously adjudicated neglectful of her two older children five years earlier, in April 2016, based on allegations of misuse of drugs and alcohol and failure to obtain medical care for her older son, and that she failed to complete certain required services following that 2016 case.

36.    In reality, ACS knew that these outdated findings were no longer a concern. Defendants' petition did not allege any evidence of current alcohol use by Ms. Rivers. The hospital never tested Ms. Rivers or TW for alcohol, despite testing for other substances. Nor did Ms. Rivers test positive for alcohol at any time during her pregnancy with TW. Defendant Abreu further acknowledged that Defendants did not have any evidence of Ms. Rivers' use of alcohol after 2015. Both family court judges who presided over her case noted that Ms. Rivers' prior history did not create an imminent risk to TW.

37.    In fact, in the months leading up to TW's birth, ACS had already concluded to its own satisfaction that it was safe and appropriate for Ms. Rivers to care for her children. ACS was aware that in 2019, Ms. Rivers filed a petition for custody of her two older children who, at the

time, were living with her grandmother. In May 2021 and the months that followed, ACS had the opportunity to investigate Ms. Rivers in connection with the custody proceeding. At the time of the investigation, ACS knew that Ms. Rivers had overnight, unsupervised visitation with her older children. ACS was also aware of the five-year-old finding of neglect concerning her older children. Despite possessing this information, ACS did not believe that Ms. Rivers was unfit to care for her older children. Between May 2021, when ACS undertook its investigation of Ms. Rivers for her custody petition, and TW's birth in August 2021, ACS did not file a report with the State Central Registry indicating any concerns about Ms. Rivers' parenting, did not recommend that a neglect case be filed against Ms. Rivers, did not make any efforts to limit her unsupervised contact with her older children, and did not oppose Ms. Rivers' custody petition. Instead, the Court-Ordered Investigation (COI) report produced by ACS in June 2021 found "there is no basis to believe that [Ms. Rivers] misuses drugs or alcohol."

38.     Finally, the September 2021 neglect petition regarding TW included an allegation that Ms. Rivers failed to plan for TW. But this was a bare assertion, without a single supporting allegation or fact. In fact, when ACS visited Ms. Rivers at her mother's (TW's grandmother's) house, they saw that Ms. Rivers had a crib, diapers, and other supplies necessary to care for the baby.

39.     In short, Ms. Rivers' and TW's positive marijuana tests were the singular intervening event between ACS's June 2021 report, supporting the return of Ms. Rivers' older children to her care, and ACS's August 2021 emergency removal of TW and September 2021 neglect petition.

40.     Upon information and belief, Defendants included pretextual allegations in the petition for removal because, in reality, Defendants targeted Ms. Rivers because of her race and

acted to separate Ms. Rivers from her baby based solely on marijuana use, which was a violation of state law.

41.     Notably, the petition did not allege any harm to TW, yet Defendants Lawani and Abreu placed the social hold on TW at the hospital, filed to have Ms. Rivers adjudicated neglectful, and sought a court order placing TW into foster care.

42.     The MRTA, effective March 31, 2021, states that "[n]o person may be denied custody of or visitation or parenting time with a minor under the family court act, domestic relations law or social services law, solely for conduct permitted under this chapter...," that is, for marijuana use, "unless it is in the best interest of the child and the child's physical, mental or emotional condition has been impaired, or is in imminent danger of becoming impaired as a result of the person's behavior as established by a fair preponderance of the evidence. For the purposes of this section, this determination cannot be based solely on whether, when, and how often a person uses cannabis without separate evidence of harm." N.Y. CANBS LAW § 127(5) .

43.     The MRTA also amended the Family Court Act to bar prosecutions based on marijuana use without explicit showings of harm to the child.  N.Y. FAM. CT. ACT § 1046(a)(iii) (McKinney 2023) ("[T]he sole fact that an individual consumes cannabis, without a separate finding that the child's physical mental or emotional condition was impaired or is in imminent danger of becoming impaired established by a fair preponderance of the evidence shall not be sufficient to establish prima facie evidence of neglect.").

44.     The MRTA further underscores longstanding New York State law that drug use alone, without any actual impairment to the child or a real and imminent risk of impairment to the child caused by the parent's drug misuse, cannot be the basis for an abuse or neglect finding. N.Y.

FAM. CT. ACT § 1012(f)(i)(B) (McKinney 2023); *In re Nassau Cnty. Dep't of Soc. Servs. ex. rel Dante M. v. Denise J.*, 661 N.E.2d 138, 140-141 (N.Y. 1995).

45.     The MRTA was preceded by ACS's guidance to its staff in April 2019 that ACS staff should act in accordance with "State and city policy [] that a parent's use of marijuana is not in and of itself a basis for indicating a report or filing a neglect case." DCP [Division of Child Protection] All Staff Bulletin April 19, 2019 From ACS Deputy Commissioner William Fletcher Division of Child Protection entitled "Policy and Practice on Cases Involving Marijuana Use By Parents."

46.     Yet, despite the longstanding prohibition of removing children solely on the basis of a drug test, and the passage of the MRTA highlighting the racial history of removing children solely on the basis of marijuana use, Defendants interfered with Ms. Rivers' custody of her child, forcibly separated Ms. Rivers from her newborn son, filed a neglect petition against her, and sought to have her newborn baby placed in foster care, solely for her use of marijuana.

47.     On information and belief, ACS workers involved in Ms. Rivers' case relied on racialized stereotypes about Black mothers who use drugs, rather than specific facts about Ms. Rivers, her conduct, and her children in deciding to take action against Ms. Rivers.

48.     Despite the passage of the MRTA in March 2021, ACS has continued its practice of using marijuana allegations against parents of color, reflecting deeply rooted biases and racialized stereotypes about marijuana use. Michelle Bocanegra, *NYC child welfare agency still citing marijuana in family separations despite legalization, state policy change*, GOTHAMIST (Sept. 2, 2022), https://gothamist.com/news/nyc-child-welfare-agency-still-citing-marijuana-in-family-separations-despite-policy-change-legalization.

49.     Despite the similar rates of drug use amongst white and non-white drug users, much of ACS's targeting and prosecution revolves around the drug use of low-income Black mothers like Ms. Rivers. *See* Movement for Family Power, *Whatever they do, I'm her comfort, I'm her protector*, 19 (June 23, 2020), https://www.movementforfamilypower.org/ground-zero.

50.     ACS's practice of separating families based on marijuana use allegations is based on the inflammatory rhetoric of the war on drugs and the resulting negative narrative of Black motherhood. *See, e.g.*, New York Times Editorial Board, *Slandering the Unborn*, N.Y. TIMES (Dec. 28 2018), https://www.nytimes.com/interactive/2018/12/28/opinion/crack-babies-racism.html.

51.     After Ms. Rivers was forced to leave the hospital without her baby, she attempted to visit TW every day. She was still in significant physical pain after having just given birth, and these daily journeys to the hospital and back were physically painful and draining on her body. During some of these attempted visits, the hospital informed Ms. Rivers that it could not locate TW, causing her distress, fear, and devastation, as well as depriving Ms. Rivers of the opportunity to visit with her baby. During these visits to the hospital, Ms. Rivers was treated with suspicion and disrespect and was stigmatized by hospital staff due to the ongoing ACS investigation.

52.     Even a short-term removal of a child from his parents is a highly destabilizing, traumatic experience. The United States government has acknowledged that "there is a profound effect on the child and family once a child is removed from home, even for a short time, that cannot be undone." Administration for Children and Families, Title VI-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020, 4052 (Jan. 25, 2000). Courts have also repeatedly recognized the "substantial injur[y]" and "traumatic experience" caused by separating parents from their children. *See Washington v. Trump*, 847 F.3d 1151, 1169

(9th Cir. 2017); *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133, 1147 (S.D. Cal. 2018).

53.     Ms. Rivers experienced emotional harm, stress, and trauma from having to come home without her newborn baby. Neighbors and friends kept asking her where her baby was, and she did not know what to tell them, feeling both humiliated and embarrassed.

54.     Defendants' conduct toward Ms. Rivers caused her to lose her pride and sense of dignity. It made her doubt her role and worth as a mother. She felt lost and empty. The pain and suffering of this time was severe. The lasting impact and trauma of the forced separation from her newborn continues to haunt and harm Ms. Rivers today. When she thinks about the separation, it feels very raw, as if it happened yesterday.

### III.   ACS continued to interfere with Ms. Rivers' parental rights for months even after drawing admonition from the Family Court and objections from her lawyers.

55.     The family court denied ACS's application to place TW in foster care.

56.     At the September 2, 2021 court appearance, Bronx Family Court Judge Hettleman stated he was inclined to release TW to Ms. Rivers that day and found it "troubling that ACS runs to Court under the circumstances" of mere allegations around marijuana.

57.     Despite the judge's admonition, ACS pursued its baseless attempt to place TW in foster care and requested an emergency hearing under Family Court Act §1027.  The hearing was continued to the next day.

58.     The following day, September 3, 2021, the family court continued the emergency hearing to adjudicate ACS's request that TW remain separated from Ms. Rivers and be placed in foster care. Defendant Abreu, testifying under the supervision of Defendant Lawani, again requested that the Court remove TW from Ms. Rivers based on allegations of Ms. Rivers' use of marijuana.

59.     Defendants, even upon questioning from a judge, could not explain a plausible nexus between Ms. Rivers' marijuana use and care of her child.

60.     The family court found that neither Ms. Rivers' alleged marijuana use, nor her neglect finding over five years prior, nor ACS's allegations that Ms. Rivers might still drink alcohol, created an imminent risk to TW sufficient to justify his continued separation from Ms. Rivers.

61.     At no point did ACS proffer or establish any evidence of harm and/or risk to the safety or care of Ms. Rivers' child.

62.     Over ACS's objections, Family Court Judge Lopez ordered the release of TW to Ms. Rivers.

63.     Judge Lopez credited the testimony and evidence indicating Ms. Rivers smoked marijuana in the hospital, but found "that still does not rise to the level of imminent risk."

64.     Following the judge's decision to reunite the family, ACS instructed the hospital to release TW to Ms. Rivers on September 3, 2021.  TW has remained in Ms. Rivers' care since that time. But the damage was done: the defendants' actions against Ms. Rivers robbed her of her peace and joy following the birth of her baby.

65.     Despite the Family Court's conclusion that TW was not at imminent risk of harm, ACS continued to interfere with Ms. Rivers' care and custody of her child for months.

66.     Through extensive advocacy by her counsel to ACS leadership, Ms. Rivers repeatedly advised ACS leadership that Defendants' case against her was illegal and improper because it was based solely on allegations of Ms. Rivers' use of marijuana.

67.     On September 7, 2021, Ms. Rivers' counsel sent an email to Alan Sputz, deputy commissioner of ACS Family Court Legal Services, and Lauren Meller, head of ACS's Bronx

Family Court Legal Services (FCLS), raising concerns about ACS's prosecution of Ms. Rivers: "the petition includes allegations of current marijuana use without making any connection to how the mother's mar[i]juana use might pose a risk to the child.... In light of all of our conversations about marijuana use in our ACS/Advocates meetings and the assurances that ACS was no longer confusing marijuana use with neglect, the recent passage of MRTA in NY, and ACS's marijuana bulletin distributed several years ago, I am concerned that we continue to see petitions like the one attached and hear arguments like those advanced by FCLS in this case." Neither Meller nor Sputz, nor anyone in ACS leadership took corrective action after receiving this email, and ACS's prosecution of Ms. Rivers continued.

68.     On October 26, 2021, Ms. Rivers' counsel sent another email to Meller and Sputz, this time including Ray Kimmelman, ACS's director of legal compliance, and Nancy Thomson, associate commissioner of Family Court Legal Services, again notifying them that the case against Ms. Rivers was improper due to its reliance on allegations of marijuana use: "In this case we prevailed in the 1027 hearing and the hearing centered almost exclusively around the fact that Ms. Rivers used marijuana. The child is released to her and she is being monitored for drug use and required to participate in multiple services. No nexus was ever established between use of marijuana and care of the child and we are asking that the court case be withdrawn." No one in ACS leadership took corrective action after receiving this email, and ACS's prosecution of Ms. Rivers continued.

69.     Despite repeated notice by Ms. Rivers' counsel to ACS supervision and leadership that the neglect filing against Ms. Rivers violated the MRTA and ACS's own guidance, Defendants Lawani and Abreu continued to prosecute Ms. Rivers for nearly three and a half months. Thus,

Defendants Lawani and Abreu acted with the consent, support, and/or ratification of ACS leadership, including Defendant Dannhauser and Defendant City of New York.

70.     Ms. Rivers was required to appear for court appearances on or about September 2, September 3, October 13, and December 6, 2021.

71.     Defendants' investigation, surveillance, and related conduct invaded Ms. Rivers' privacy and caused her humiliation, stress, trauma, and emotional distress.

72.     Defendants, including Defendant Abreu and other ACS personnel, made repeated, unannounced visits to Ms. Rivers' home, including middle-of-the-night visits that awakened and accosted her family and disrupted TW's sleep. These sleep disturbances negatively affected TW's sleep patterns.

73.     ACS workers threatened to call the police if Ms. Rivers did not let them into her home.  Defendants Lawani and Abreu did not advise Ms. Rivers of her rights at any time.

74.     During ACS's home surveillance intrusions, the caseworkers did not wear masks, in violation of ACS's COVID policies, and refused to show proof of vaccination to Ms. Rivers, causing Ms. Rivers fear and distress for the health of her newborn baby during the height of the COVID-19 pandemic.

75.     In addition to the middle-of-the-night visits, ACS's repeated daytime home visits and intensive requirements for "services" interfered with Ms. Rivers' ability to work and parent her newborn.

76.     Before ACS began its investigation against Ms. Rivers, she ran a business out of her home styling hair. ACS's constant visits to, and disruption of, Ms. Rivers' home interfered with Ms. Rivers' hair appointments with her clients and drove them away.

77.     Throughout their unlawful investigation and prosecution of Ms. Rivers, ACS sought baseless requirements against her, including but not limited to supervision, surveillance, unannounced visits, mandatory random drug testing, and participation in various drug programs, counseling, and evaluations.

78.     Because of the prosecution, Ms. Rivers was required to attend weekly counseling sessions and participate in mandatory classes and programs. She had to take time from her work and family, and would not have participated but for ACS's requirement that she do so.

79.     Because of the prosecution, Ms. Rivers was required to undergo at least 6 mandatory drug tests. She had to travel to the drug testing facility, take time from her family and work, and would not have undergone these tests but for ACS's requirement that she do so.

80.     These burdensome requirements and the repeated home visits interfered with Ms. Rivers' ability to provide services to her clients, causing her to lose her business and earnings. These intrusions forced Ms. Rivers to close her business and refund customers their deposits for hairstyling services.

81.     Before ACS began its investigation against Ms. Rivers, she was in the midst of proceedings to have her two older children returned to her custody. On information and belief, the custody case was expected to resolve soon because neither ACS nor any relevant party opposed Ms. Rivers' custody petition prior to TW's birth. Defendants Lawani and Abreu's filing of the neglect petition regarding TW interrupted and delayed her reunification with her older children. Based on Defendants Lawani and Abreu's representations about Ms. Rivers and the status of the case about TW, the referee in the custody case delayed the resolution of the custody proceeding. Ms. Rivers did not regain custody of her older two children until January 2023. She was separated

from two of her three children for an additional year, causing her emotional devastation, trauma, and distress.

82.     Ms. Rivers felt targeted by ACS and believes that Defendants targeted her because of her race. She has seen in her community and in her family the impact of ACS's relentless surveillance and prosecution of Black families: breaking up homes and tearing families apart.

83.     On December 14, 2021, over 100 days after initiating its investigation, ACS finally voluntarily withdrew and dismissed the neglect petition and all charges against Ms. Rivers, resulting in the termination of the proceeding in favor of Ms. Rivers.

**IV.   ACS's interference with the Rivers family was the result of an ACS policy, practice, and custom of being unduly punitive toward Black parents.**

84.     The interference with Ms. Rivers' parental rights in contravention of law and written guidance was not the result of a few bad actors, nor an errant failure to follow law and written policy. Instead, as set forth below, it was the direct result of an ACS policy and practice of treating Black parents more punitively than white parents.

*A.   ACS has a long history of being more punitive toward Black parents than parents of other races, and ACS workers have long felt pressured to remove Black children from their families.*

85.     Since at least 2015, the Office of Children and Family Services (OCFS)—the state agency overseeing ACS—has found that there are extreme disparities in the outcomes for Black families in ACS proceedings, as compared to white families.

86.     Black children in New York City are more likely, over their lifetime, to be subject to an ACS investigation than white children. Based on data from 2014 through 2018, 44% of Black children were subject to an ACS investigation during their lifetime, while only 19% of white children were.

87.     In 2020 in New York City, Black children made up 23% of the general child population, 41.8% of ACS's investigations, and 52.9% of children placed in foster care, meaning removed from their families.  NYC Workforce Institute, "Race/Ethnicity and Path through the Child Welfare System, CY 2020." In 2019 in New York City, Black children comprised 23% of the general child population, 41.4% of investigations and 55.5% of children placed in foster care. *See* 10/28/2020 Commissioner Hansell testimony to NYC Council Committee on General Welfare at p. 3. In other words, Black children were removed from their families at a higher rate than other children whose families were investigated by ACS.  On information and belief, the same was true in 2018, when Black children made up 24.3% of the NYC population but 53.8% of the children placed in foster care.

88.     In 2021, Black children were much more likely to enter foster care than white children. In the period between July and September 2021 in New York City, 323 Black children entered foster care compared to 31 white children. In 2021 generally in New York City, 1,267 Black children entered foster care, making up 47.1% of the total child population entering foster care that year. That same year, 126 white children (4.7%) entered foster care. As of the 2020 census, Black children made up 20.5% of the New York City child population, while Latinx children comprised 33.6% of the population and white children 25.2%.

89.     As early as 2016, ACS itself acknowledged that Black children are more disproportionately overrepresented in New York City compared to nationally at every decision point in the child welfare system. *See* Racial Equity Impact Assessment (REIA) Policy Report, revised 11/2016 at p. 6 (relying on data from 2014).

90.     Consistent with what the data shows, internal ACS reports show that ACS staff have long felt pressured by ACS leadership to be more punitive toward Black families and enforce

a racially biased standard of assessing safety. According to a 2016 internal report, ACS understands that "Even when child welfare practitioners are people of color, they are required by their employer to perform in a way that is consistent with their white counterparts and that of the established organizational and institutional culture, which are part of the established system." REIA Policy Report at p. 9. Upon information and belief, what this means is that staff felt pressure to treat Black parents through a white lens, i.e., to treat Black parents as more suspect or deserving of punishment.

91.     ACS leadership has admitted that the agency treats Black families differently. When asked about ACS's racial disparities, then-Commissioner Gladys Carrion admitted in 2015 that the factor motivating the racial disparity "is really racism." Roxana Saberi and Lisa Semel, *In NY, black families more likely to be split by foster care system*, Al Jazeera America (June 25, 2015),       http://america.aljazeera.com/articles/2015/6/25/new-york-foster-care-system-racial-disparity.html.

92.     In testimony to the New York City Council in October 2020, then-Commissioner David Hansell recognized that "the experience of Black/African American children is different from other children" because Black children are removed and placed in foster care at much higher rates than other children. 10/28/2020 Commissioner Hansell testimony to NYC Council Committee on General Welfare at p. 15.

B.     *When faced with information that required action to prevent racial discrimination against Black parents, ACS time and again chose not to act or chose to take steps that would not remedy the problem.*

93.     In response to the extreme racial disparities outlined above, since at least 2016, ACS has received extensive recommendations for the agency to take actions to remedy and prevent racial discrimination against Black parents. Despite many recommendations coming from within

the agency itself, ACS repeatedly chose not to act on the recommendations. ACS further chose to take steps that would obviously not remedy the racial disparities.

94.     In 2016, an internal ACS equity working group made two sets of recommendations: a broader set of recommendations to make ACS more accountable to racial equity concerns and a narrower set of recommendations to support racial equity and fairness when creating policy. REIA Policy Report at p. 12.

95.     ACS described the first set of recommendations as a Racial Equity Accountability Procedure (REAP), which would change how the agency divisions collaborated to be more accountable to racial equity concerns. *Id*. The second set of recommendations, described by ACS as Racial Equity Impact Assessment (REIA) recommendations, addressed the creation of racially equitable policies. *Id*. at p. 12-13.

96.     ACS failed to implement many of the recommendations generated by the internal working group.  For example, to identify policies that contribute to racial disproportionality and prioritize which policies should be revised, ACS was to develop a ranking system for assessing policies with a racial equity lens. *Id*. at p. 22. ACS has not published this ranking system nor mentioned it in any public statement or testimony, including testimony specifically meant to address the agency's racial disproportionality. In a recent Freedom of Information Law (FOIL) request made by The Bronx Defenders, ACS turned over the 2016 internal working document recommending the ranking system; yet it did not produce the ranking system or any documents indicating the ranking system existed or was being used.

97.     ACS also failed to revise policies that contribute to racial disproportionality. For instance, ACS's emergency removal policy, Child Safety Alert #30, has not been revised since being issued in 2010, despite removals and placements into foster care being one of the most

racially disproportionate decisions the agency makes. In 2019, ACS issued a policy regarding the balancing factors ACS must consider when removing children yet did not explain how this guidance interacted with the 2010 Emergency Removal policy, nor did it explicitly address how to combat racial biases when making removal determinations. In 2021, an organization contracting with ACS created an extensive, detailed toolkit meant to identify and revise policies causing racial disproportionality, something ACS would not have needed had it followed its own recommendation to create a ranking system.

98.     Another recommendation from ACS's internal working group in 2016 was the creation of a new policy to guide ACS in providing and soliciting feedback from staff and affected community members about the agency's racial disproportionality. REIA Policy Report at p. 22. ACS has not published this policy, nor mentioned that it exists. Had ACS drafted this policy, the 2021 toolkit designed to solicit staff feedback in creating more equitable policies would not be necessary.

99.     To create a feedback loop between ACS policy writers and community members, the internal working group also recommended placing a comment box on the webpage for each policy listed on the Policy Unit's website. *Id.* While those outside ACS could comment on policies, the comment box was also the mechanism that frontline ACS staff could use to provide feedback during the drafting process of any policies. *Id.* at 23. ACS was to ensure that comments could be made anonymously. *Id.* at 22. ACS did not follow this recommendation. The agency has a website for draft policies, but it includes no comment boxes. Rather, parties are instructed to email any comments to a particular email address. ACS does not provide a mechanism for providing feedback to existing policies, whether through a comment box or even an email, despite the internal recommendation to do so.

100.    The 2016 internal working group further recommended that ACS routinely collect and publish racial and ethnic data on decision-making points at critical junctures in a case. *Id.* ACS failed to consistently publish this data, despite having access to it internally. In fact, not until the New York City Council issued Local Law 132 in 2021—requiring ACS to publish demographic data—did ACS make the information publicly available in a systematic way. Moreover, the 2020 Racial Equity Audit revealed that ACS did not have standard operating procedures for collecting data on racial inequities. New York City Administration for Children's Services Racial Equity Participatory Action Research & System Audit: Findings and Opportunities ("NIS Report") at 28.

101.    In October 2020, then-Governor of New York Andrew Cuomo signed an administrative directive that required all local social services agencies, including ACS, to use an anonymous process (often referred to as a "blind" process) to determine whether to effectuate removals of children, meaning that workers did not know the names, race, or address of the children at issue. 10/14/20 Administrative Directive, 20-OCFS-ADM-19. The directive requires ACS to implement a Blind Removal Committee, a Blind Removal Monitoring and Tracking Plan, and a Quality Assurance Process. *Id.* At 6–7. The directive was based on data from another child welfare agency (in Nassau County) showing a significant decrease in racial disparities in child removals after implementing an anonymous removal process. *Id.* at 3.

102.    On information and belief, Defendants have not implemented the anonymous removal process, despite the governor's directive and despite knowing that the process could improve racial disparities even before the administrative directive. *See* Appendix I: Response from the New York City Administration for Children's Services (ACS), February 1, 2022, https://www.hrw.org/sites/default/files/media_2022/11/appendix%20i.pdf at 154 (ACS providing

no response to question about what steps the agency has taken on this requirement). In 2019, in testimony to the New York State Assembly, then-Commissioner of OCFS Sheila Poole testified, in a panel that included ACS's Deputy Commissioner for Prevention Services and Acting Deputy Commissioner for External Affairs, about the success of the anonymous removal process in Nassau County.  In 2020, then-Commissioner Hansell testified to the City Council that ACS was "very familiar" with the anonymous removal process, having met with one of the main proponents of the process and discussed the process with Nassau County agency officials.

C.    *An audit of ACS operations found that staff felt pressured to be more punitive toward Black parents almost nine months before ACS interfered with Ms. Rivers' custody and care of her newborn son.*

103.    In or around spring of 2020, ACS publicly acknowledged its responsibility to correct racial bias in its operations and suggested it was taking steps to do so through an internal auditing process. As will be shown below, however, when the audit concluded that ACS staff felt pressured by leadership to be more punitive toward Black parents, ACS tried to bury the report and failed to follow any of its recommendations.

104.    Specifically, in the spring of 2020, the National Innovation Services ("NIS") began conducting the 2020 Racial Equity Audit. The purpose of this audit, according to then-Commissioner Hansell, was to identify key areas of intervention and to implement strategies to lessen ACS's racial inequities.  10/28/2020 Commissioner Hansell testimony to NYC Council Committee on General Welfare at p. 19. Specifically, then-Commissioner Hansell publicly testified to the New York City Council that the 2020 Racial Equity Audit would evaluate ACS's "systems and activities as they relate to the racial equity experiences, needs, and priorities of frontline staff, families, and communities, and to identify key areas of intervention to drive system-level change." *Id.*

105.    Hansell also testified that the 2020 Racial Equity Audit was motivated in part to address the "[r]acial disparity [that] has been the legacy of the child welfare system," and that the agency must do more to "respond effectively to structural racism and individual bias." *Id.* at 20.

106.    In conducting the 2020 Racial Equity Audit, NIS reviewed ACS policies, data with racial and economic indicators, and surveyed more than 45 ACS employees, including frontline caseworkers and employees in leadership positions, along with parents and advocates.

107.    In December 2020, NIS issued a draft report to ACS finding that "ACS disrupts the safety of Black and Brown families[,]" and that ACS staff feel pressured to remove children from, prosecute, and punish Black parents more than white parents. NIS Report at 14.

108.    The draft report contains numerous findings based, *inter alia*, on ACS staff statements, that staff are more punitive toward Black and brown parents.[1]

109.    The 2020 Racial Equity Audit reported that ACS is "a predatory system that specifically targets Black and Brown parents and applies a different level of scrutiny to them throughout their engagement with ACS." *Id.* at 14.

110.    The 2020 Racial Equity Audit found that ACS "staff and [ ] leadership" spoke of "fac[ing] intense scrutiny to justify their work and protect themselves from retribution in the agency." *Id.* at 21.

111.    The 2020 Racial Equity Audit found that "[t]his dynamic produces incentives for staff that orients their work around protecting themselves from internal consequences rather than ensuring the safety of a family." *Id.* at 21.

---

[1] While the 2020 Racial Equity Audit describes harm to, and discrimination against, Black and brown people, this case focuses on ACS's historic and current discrimination against Black parents and families.

112.    The 2020 Racial Equity Audit found that this culture and dynamic "frequently means staff err on the side of safety for themselves, by seeking removal and thereby ensuring that they won't be liable in the case of abuse." *Id.* at 21.

113.    The 2020 Racial Equity Audit found that "[s]taff at all levels in the agency acknowledged that both internal and external pressures create a need to have a scapegoat when things go wrong in a case, which pushes internal departments and staff to limit their exposure to culpability at all costs." *Id.* at 21.

114.    The 2020 Racial Equity Audit reported that "[s]taff frequently stated that this culture of fear incentivized the removal of children." *Id.* at 21.

115.    The 2020 Racial Equity Audit reported that "once in the system, Black and brown parents continue to receive more scrutiny than white parents." *Id.* at 14.

116.    The 2020 Racial Equity Audit reported that staff "describe a system that gives preferential treatment to white parents." *Id.* at 15.

117.    The 2020 Racial Equity Audit reported that "[w]hite parents are more likely than Black and Brown parents to ... experience leniency with respect to removals and reunifications." *Id.* at 15.

118.    The 2020 Racial Equity Audit findings were delivered to ACS, including then-ACS commissioner Hansell, no later than December of 2020—eight months before ACS unlawfully separated newly-born TW from Ms. Rivers and then proceeded to prosecute Ms. Rivers.

119.    The 2020 Racial Equity Audit confirmed what ACS had already been on notice about for years: racially disparate outcomes for Black children and families in ACS proceedings are a result of racial bias in ACS operations. The NIS report found, specifically, that: "Frontline staff and lower-level managers in DCP [Division of Child Protection] identified a clear racial

hierarchy within ACS, which means that Black and Brown staff don't have the power to have to inform policies and practices and voice their experiences of racism. For staff, there was a clear delineation between the culture and racial makeup of 'central office' and the borough offices. The central office was described as predominantly white, where staff rarely had direct service experience and often were hired from graduate school or adjacent social service systems. In contrast, borough offices were depicted as having majority Black and Brown staff who often reside in the communities they serve and were led by leaders with direct service experience at ACS. DCP staff described a dynamic where predominantly white leaders in the central office make policy for Black staff to carry out in the borough offices." NIS Report at 21.

120.    ACS leadership were in possession of the 2020 Racial Equity Audit report eight months before Ms. Rivers was separated from her newborn son.

### D. ACS leadership sought to bury the audit report and took no action or chose to take steps that would obviously not remedy the problem.

121.    Despite the alarming results in the 2020 Racial Equity Audit report, yet again, ACS responded to concrete and concerning information of racial bias in its operations by refusing to take meaningful corrective action and burying the evidence that a problem existed.

122.    ACS sought the assistance of and input from advocates who represent parents in ACS proceedings as part of the 2020 Racial Equity Audit, including The Bronx Defenders. ACS and NIS held a meeting with advocates who provided assistance, including The Bronx Defenders, on October 4, 2021. During this meeting, ACS acknowledged that it had received a report from NIS nine months earlier. However, when the advocates asked ACS to share the report, ACS demurred. ACS did not provide the report, nor did it make the report publicly available, despite touting the report in testimony to the New York City Council and in its 2021 written report regarding efforts to increase racial equity, as required by Local Law 174.

123.     Unable to obtain the audit report from ACS, The Bronx Defenders submitted a Freedom of Information Law Request (FOIL) seeking the audit report and information about the audit, including, *inter alia*, information and material gathered as part of the audit and material showing steps ACS took in response to the audit.

124.     Pursuant to the FOIL request, on April 27, 2022, ACS produced to The Bronx Defenders the December 2020 Racial Equity Audit draft report and two slide decks from NIS. ACS failed to produce any of the other requested information.

125.     After repeated follow up, including internal appeals, by The Bronx Defenders, ACS finally produced additional responsive material on December 13, 2022. ACS indicated it was withholding additional material but did not provide the basis for refusing to produce those documents, which it had no legal right to withhold.

126.     The materials ACS did produce showed that despite extensive discussions in and around January 2021 about the 2020 Racial Equity Audit by ACS's senior leadership, including then-Commissioner Hansell, ACS wholly failed to meaningfully respond to findings or recommendations in the 2020 Racial Equity Audit report, including for example:

    a.  NIS co-designed, with ACS's Office of Equity Strategies (OES), a Continuous Quality Improvement process focused on racial equity.  The purpose of this 5-step process was "to help divisions within ACS identify racial inequities, design solutions, and measure their success." NIS Racial Equity Systems Design Slide Deck. As a next step in the process, OES was to launch a pilot, using the 5-step process, with the Division of Child Protection (DCP). After doing so, OES was to adapt the pilot for use in other ACS divisions. On information and belief, ACS did not launch the policy improvement process. NIS also recommended, prior to

beginning the policy improvement process, that ACS build a team to support the process and educate staff to engage in the process. In response to the FOIL request, ACS did not produce material to suggest ACS followed these directives. For example, there are no emails including or regarding the team meant to support the policy-improvement process. Such emails would have been responsive to the FOIL request and would not have been subject to a FOIL exemption. Neither are there emails explaining the 5-step process or requiring staff to review the project readout created by NIS. Such emails would have been responsive to the FOIL request and would not have been subject to a FOIL exemption. Finally, there are no agendas for meetings between OES and the Division of Child Protection, despite NIS providing agenda samples. Such agendas would have been responsive to the FOIL request and would not have been subject to a FOIL exemption.

b. As the first step of the process, ACS was to survey staff to identify policies that result in racial inequities and request recommendations on how to make polices more equitable. In its response to the FOIL request, ACS did not produce any material to suggest ACS did so. For example, there were no documents containing the survey, no announcements to staff explaining the survey, and no survey results. Such materials would have been responsive to the FOIL request and would not have been subject to a FOIL exemption.

c. NIS made numerous other recommendations within the 2020 Racial Equity Audit report to which ACS failed to respond. For example, the audit report made numerous recommendations that ACS center the experience of Black families:

"Start in equity through listening and thoroughly understanding what Black and Brown families need and want"; "[e]stablish metrics and collect data around family-defined measures of success"; "[r]edesign investigation to be family-centered." NIS Report at 17-28, 22. To center Black families, ACS would need to get their input. The agency's response to the FOIL request did not include any documents or information that ACS has made any efforts or created any mechanisms to gather, in a systematic and consistent manner, Black families' opinions. Such material would have been responsive to the FOIL and would not have been subject to a FOIL exemption.

d.   The audit report recommended that ACS support the creation of Miranda-style rights for parents facing an ACS investigation. ACS did not produce material in the FOIL response to suggest that ACS supported proposed legislation creating these rights or that they made efforts to provide these rights independently. Such material would have been responsive to the FOIL request and would not have been subject to exemptions. Instead, ACS leadership quashed proposed New York City Council legislation giving parents these rights.  Grench, Eileen, *City, Union Push Back on Informing Parents of Rights in Child-Welfare Probes,* THE CITY (Oct. 19, 2021), https://www.thecity.nyc/2021/10/19/22735575/nyc-child-welfare-probes-parents-not-told-their-rights.

e.   The audit report further recommended that ACS end removals for poverty and focus on abuse, including advocating with the New York legislature to more specifically and tightly define the legal standards for neglect and imminent risk of harm. In its FOIL response, ACS did not include any documents or

information that ACS has made efforts or created mechanisms to end removals

for poverty and focus on abuse cases. For example, there are no documents

demonstrating ACS's advocacy to change the neglect legal standards, nor did

the FOIL response contain information that ACS has reviewed its own policies,

such as the 2010 Child Safety Alert regarding the emergency removal of children

and the 2019 policy regarding the factors to consider prior to removal, with a

racial equity lens. Such material would have been responsive to the FOIL request

and would not have been subject to a FOIL exemption. Moreover, ACS's data

indicates that neglect cases continue to constitute the bulk of ACS's removals.

In 2021, ACS removed roughly 1057 children in neglect cases compared to

approximately 298 children in abuse and abuse and neglect cases. CHILD

WELFARE INDICATORS ANNUAL REPORT CY 2021 13-14 (2021),

https://www.nyc.gov/assets/acs/pdf/data-

analysis/2021/CityCouncilReportCY2021.pdf.

127.     Despite the fact that the 2020 Racial Equity Audit found that the problem is

leadership pressure, ACS focused its efforts outside the agency. In public statements to media after

The Bronx Defenders provided the audit report to The New York Times, Defendant Dannhauser

failed to acknowledge ACS's responsibility for racial disparities in the system, instead stating,

"The first and most inequitable part of our system, racially inequitable part of our system are the

calls that are coming in." However, the data available over many years and the findings in the audit

report demonstrate that the racial disparities only increase in ACS's handling of the reports it

receives, even if there might also be racial disparities in the reports.

128.    OCFS data demonstrates that once a report is made to the State Central Registry (SCR) and ACS begins investigating an allegation of child abuse or neglect, Black families face worse outcomes than other families, at a disproportionately high rate. Thus, the fact that Black people might be subject to more calls to the SCR does not explain the racially disparate outcomes when ACS takes action.

129.    In the eight months after ACS received the 2020 Racial Equity Audit and before ACS workers interfered with Ms. Rivers' parental rights, it appears that ACS took no steps to ease pressure on staff to be unduly punitive toward Black parents or to prevent racially biased outcomes in ACS proceedings against Black parents.

*E. The legislature passed the MRTA provision prohibiting interference with parenting based solely on marijuana use to prevent this kind of racial bias problem at ACS.*

130.    Because of problems like racial bias in ACS operations, the state legislature passed a law explicitly detailing the racial history of policing marijuana use and prohibiting interference with parental rights based on marijuana use—which was often used as pretext for racially biased ACS proceedings.

131.    Specifically, the MRTA legalized the use of marijuana across New York State.  It also legalized the production, distribution, and use of marijuana and created a system for regulating the industry. In recognition of the longstanding problems within the child welfare system, including its treatment of parents who use marijuana, the Legislature included a provision entitled "Protections for the use of cannabis; unlawful discriminations prohibited." This part of the law mandates that "[n]o person may be denied custody of or visitation or parenting time with a minor under the family court act, domestic relations law or social services law, solely for conduct permitted under this chapter...," that is, for marijuana use. N.Y. CANBS LAW § 127(5).

132.    In enacting this legislation, the New York State Legislature found that past marijuana law and practices had resulted in "devastating collateral consequences including mass incarceration and other complex generational trauma … [that] have disproportionately impacted African-American and Latinx communities." The purpose of marijuana legalization was "to address the collateral consequences" of past criminalization of marijuana and to "end the racially disparate impact of existing cannabis laws." N.Y. CANBS LAW § 2.

133.    In violation of this clear and unequivocal law, ACS instituted the social hold at the hospital, filed the neglect petition against Ms. Rivers, and sought placement of TW in foster care, all despite knowing that TW had not been harmed and was not at risk of being harmed. Defendants' actions caused interference with Ms. Rivers' custody and right to parent her child, in violation of the Federal and New York Constitutions and the MRTA.

134.    Ms. Rivers, as a Black mother whose child was removed based solely on marijuana use despite no evidence of danger or harm, belongs to the class of people whom the MRTA intended to benefit.

135.    Although the MRTA clearly contemplates the negative effects of marijuana regulation on Black and Latinx communities and forbids discrimination on the basis of marijuana use, the law leaves a noticeable gap with respect to the enforcement of the potent nondiscrimination provision.

136.    Specifically, while the MRTA mandates that ACS may not discriminate against people and separate families for marijuana use, N.Y. CANBS LAW § 127(5), the MRTA is primarily a licensing statute that sets forth a licensing scheme for cannabis sellers.

137.    The law's primary enforcement provision is embedded within—and therefore limited to—the article creating the Cannabis Control Board, such that its application is limited to enforcing regulations regarding the business of cannabis.

138.    As a result, Ms. Rivers must seek a remedy for ACS's clear violation of the MRTA through the courts.

   F.   *ACS's actions and failures to act in the face of a known racial bias problem constitutes a policy and custom of racial discrimination pursuant to which ACS separated Ms. Rivers from her baby and interfered with her parenting rights.*

139.    As set forth in more detail above, ACS has long been aware that it has a problem with treating Black parents unequally and more punitively than white parents and ACS has long known that its leadership and its practices pressured staff to be unduly punitive and discriminatory toward Black parents.

140.    As set forth in more detail above, ACS knew this pressure on staff in part manifested as workers interfering with Black parental rights even when ACS policies—if applied as written—would have prevented the interference.

141.    As set forth in more detail above, ACS repeatedly failed, over many years, to take meaningful action or to take obviously necessary steps to address the racial bias in its operations or to prevent workers from feeling pressure to be unduly punitive toward Black parents.

142.    ACS has a policy, practice and/or custom of discriminating against Black parents by being unduly punitive toward Black parents as compared to white parents, and this policy, practice, and/or custom is intentional and ACS has demonstrated deliberate indifference and/or active acquiescence to the known risk that staff would be unduly punitive toward Black parents.

143.    ACS's interference with the Rivers family based on marijuana use despite state law and written ACS guidance prohibiting such interference is consistent with and was, upon

information and belief, pursuant to this ACS policy, practice and/or custom of discrimination

against Black parents, which includes but is not limited to: the pressure ACS placed on staff to

remove children of Black parents even when it might not be consistent with stated or written ACS

policies or guidance; ACS staff's interference with a Black parent's custody and control of her

child even though it was inconsistent with stated ACS guidance and state law; and ACS leadership

condoning and supporting that interference for weeks despite objections from the parent's lawyers

that it was not lawful.

### First Cause of Action: Racial Discrimination (Fourteenth Amendment)
42 U.S.C. § 1983
*Against Defendants City of New York and Dannhauser*

144.     Paragraphs 1-143 are incorporated by reference as if set forth fully herein.

145.     The City Defendants have implemented and enforced a practice and/or custom of

improperly removing children from their parents and interfering with parental custody, care, and

control, based on race rather than risk of harm to the child.

146.     Each of the Defendants acted with intent and deliberate indifference to Plaintiff's

Fourteenth Amendment rights.

147.     The City Defendants' discriminatory policy, practice, and/or custom includes but

is not limited to pressuring ACS staff to remove children and/or interfere with parental custody,

care, and control when the parent is Black and failing to take obviously necessary action to prevent

improper removals and/or interference with parental rights in Black families.

148.     As a direct and proximate result of the aforesaid acts and omissions of the City

Defendants, and as a direct and proximate result of the City Defendants' discriminatory policy,

practice, and/or custom, Defendants acted under color of state law to forcibly and improperly

separate Ms. Rivers from her baby and interfere with her parental rights based on her race, violating Ms. Rivers' Fourteenth Amendment rights.

149.    As a result of Defendants' actions in violation of the Constitution, Ms. Rivers suffered humiliation, pain and suffering, terror, and mental anguish, and lost wages and incurred expenses.

**Second Cause of Action: Racial Discrimination (New York Constitution)**
Violation of Article I, §11 of the New York State Constitution
*Against Defendants City of New York and Dannhauser*

150.    Paragraphs 1-149 are incorporated by reference as if set forth fully herein.

151.    The City Defendants have implemented and enforced a practice and/or custom of improperly removing children from their parents and interfering with parental custody, care, and control, based on race rather than risk of harm to the child.

152.    Each of the Defendants acted with intent and deliberate indifference to Plaintiff's Fourteenth Amendment rights.

153.    The City Defendants' discriminatory policy, practice, and/or custom includes but is not limited to pressuring ACS staff to remove children and/or interfere with parental custody, care, and control when the parent is Black and failing to take obviously necessary action to prevent improper removals and/or interference with parental rights in Black families.

154.    As a direct and proximate result of the aforesaid acts and omissions of the City Defendants, and as a direct and proximate result of the City Defendants' discriminatory policy, practice, and/or custom, Defendants acted under color of state law to forcibly and improperly separate Ms. Rivers from her baby and interfere with her parental rights based on her race, violating Plaintiff's rights under the New York State Constitution.

155.     As a result of Defendants' actions in violation of the Constitution, Ms. Rivers suffered humiliation, pain and suffering, terror, and mental anguish, and lost wages and incurred expenses.

### Third Cause of Action: Procedural Due Process (Fourteenth Amendment)
42 U.S.C. § 1983
*Against Defendants Abreu and Lawani*

156.     Paragraphs 1-155 are incorporated by reference as if set forth fully herein.

157.     Plaintiff Ms. Rivers had a protected liberty interest in the care and custody of her child, TW, as mandated by the U.S. Constitution and the New York Cannabis Law.

158.     Based on the conduct alleged herein, Defendants' actions against Ms. Rivers deprived her of due process.

159.     There was no lawful basis for Defendants' actions, which were clearly prohibited both by the New York Cannabis Law and the U.S. Constitution.

160.     As a result, Ms. Rivers suffered humiliation, pain and suffering, terror, and mental anguish, and lost wages and incurred expenses.

### Fourth Cause of Action: Procedural Due Process (New York Constitution)
Violation of Article I, §6 of the New York State Constitution
*Against All Defendants*

161.     Paragraphs 1-160 are incorporated by reference as if set forth fully herein.

162.     Article I, Section 6 of the New York Constitution states that "No person shall be deprived of life, liberty or property without due process of law."

163.     Plaintiff Ms. Rivers had a protected liberty interest in the care and custody of her child, TW, as mandated by the New York State Constitution and the New York Cannabis Law.

164.     Based on the conduct alleged herein, Defendants' actions against Ms. Rivers deprived her of due process.

165.     There was no lawful basis for Defendants' actions, which were clearly prohibited both by the New York Cannabis Law and the New York State Constitution.

166.     As a result, Ms. Rivers suffered humiliation, pain and suffering, terror, and mental anguish, and lost wages and incurred expenses.

### Fifth Cause of Action: Violation of the Marihuana Regulation & Taxation Act (N.Y. Cannabis Law)
*Against All Defendants*

167.     Paragraphs 1-166 are incorporated by reference as if set forth fully herein.

168.     The New York Cannabis Law prohibits discrimination against individuals for the use of marijuana. N.Y. CANBS LAW § 127.

169.     The Law specifically provides that a parent may not be denied custody of or visitation or parenting time with a minor solely for using marijuana. N.Y. CANBS LAW §127(5).

170.     Based on the conduct alleged herein, Defendants violated the New York Cannabis Law by denying Ms. Rivers parenting time with TW solely for using marijuana.

171.     As a result of Defendants' actions in violation of the laws of the State of New York, Ms. Rivers suffered humiliation, pain and suffering, terror, and mental anguish, and lost wages and incurred expenses.

### Prayer for Relief

172.     WHEREFORE, Plaintiff Ms. Rivers respectfully requests that this Court:

a.   Issue declaratory relief that Defendants' actions violated Ms. Rivers' rights, including under the Equal Protection Clause of the Federal and New York State Constitutions,  the Procedural Due Process Clause of the Federal and New York State Constitutions; and New York Cannabis Law Section 127(5);

b.  Find the City of New York vicariously liable to Ms. Rivers for the violations of state law and the state Constitution under the doctrine of respondeat superior;

c.  Award damages to Ms. Rivers in an amount to be determined by a jury;

d.  Award costs, attorneys' fees, and interest;

e.  Grant such other and further relief as this Court may deem just and appropriate.

Dated:  May 17, 2023
        New York, New York

Respectfully Submitted,

**THE BRONX DEFENDERS**
Niji Jain
Anne Venhuizen
360 East 161st Street
Bronx, New York 10451
(718) 838-7838
NijiJ@bronxdefenders.org
AnneV@bronxdefenders.org

*Counsel for Plaintiff*

**ARNOLD & PORTER KAYE SCHOLER LLP**
Michael D. Schissel
Lucy McMillan
250 West 55th Street
New York, NY 10019
(212) 836-8000
Michael.Schissel@arnoldporter.com
Lucy.McMillan@arnoldporter.com

*Counsel for Plaintiff*